[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION TO MODIFY CUSTODY
CT Page 8502
This post-judgment motion for modification involves the custodial placement of Sonja, the former spouses' eight year old daughter. At the hearing, both parents testified. There was also testimony from a day care worker (a niece of the mother); Dr. Brian Heath, a licensed psychologist; the Family Services officer, David Henriques; and a family acquaintance. Both parents and the child were represented by counsel. In addition, a guardian ad litem was appointed for the child.
The procedural history and relevant facts found are as follows.
A decree dissolving the parties' marriage entered on August 11, 1988, in which by agreement, the plaintiff mother was granted sole custody of Sonja, born June 7, 1986, subject to reasonable rights of visitation to the defendant father. Very soon after, by written stipulation of the parties dated April 30, 1989, and approved by the court on June 5, 1989, the judgment was modified, awarding sole custody to the father with reasonable rights of visitation to the mother. Sonja has continued to reside with her father from April, 1989, to the time of trial.
With the exception of two motions for contempt, motions for payment of child support and for specific visitation,[1] the case lay largely quiescent until the plaintiff's motion to modify custody filed June 1, 1993 which was the genesis of this hearing. After June 1, 1993, the following occurred: the parties agreed to a further modification of the specific visitation schedule granting the mother one weekday per week, enlarging the alternate weekend visitation to commence Friday evenings, and adding two non-consecutive weeks in the summer and school vacations. The case was referred to family services for study and recommendation. Both an attorney and guardian ad litem were appointed for the child. The motion by the child's attorney for a psychological evaluation of the child was granted. The parties were ordered to and did participate in the "Parenting Education Program," so called, pursuant to 1993 Public Acts No. 93-319. Upon motion, drug testing was ordered for both parties, and a psychological evaluation ordered of the father. The mother voluntarily submitted to such examination. CT Page 8503
On April 19, 1994, the court, upon written agreement of the parties, entered a temporary order of joint legal custody with primary physical custody in the father and specified visitation with the mother. The visitation was basically that previously ordered and expanded to four weeks in the summer. Other orders were also entered pursuant to that agreement relating to school activities, drug testing, telephone contact, contact with the child's therapist, family counseling, a family relations investigation and recommendation, and the matter was continued for compliance and to this hearing on the plaintiff's motion to modify the custody.
In the interim, a number of motions were filed seeking to hold the father in contempt, and he was found in contempt on June 27, 1994, for failing to cooperate in the completion of the psychological evaluation, interfering with telephone contact between the mother and child and failing to bring the child to, and maintain contact with, the child's therapist.
Although both parties agreed at this hearing to a `final' order of joint legal and physical custody, they were at issue over where the child would live and attend school and other terms of the joint custody. The mother essentially proposed that Sonja live with her during the week in Colchester and begin school there beginning September, 1994, and be with her father every weekend from Friday evening through Sunday. The father, who resides in Norwich, agreed with the recommendation of the Family Services officer which was joint legal and physical custody of Sonja to both parents. This scenario suggested that Sonja reside on alternating weekends with each parent from the end of school Friday to the beginning of school Monday, and Sonja to be with her mother from the end of school Mondays to Wednesday mornings each week, and with father the balance of the week.
The family relations officer also proposed review of his suggested order in December, 1994, "for the purpose of modifying custody to mother so that Sonja can attend school in Colchester in January, 1995".
The child's attorney supported the mother's position. The guardian ad litem testified that Sonja stated that she wished to live with her father and remain in her school in Norwich where she has always gone. It was the guardian's CT Page 8504 opinion that the child's desire was not very strongly held, and that Sonja would accept living with her mother so long as she could see her father "as much as she now sees her mother". The guardian ad litem essentially agreed with the Family Services officer's recommendation.
Dr. Heath saw the mother and child a number of times and administered a battery of psychological tests to the mother. He describes the mother-child relationship as loving and believes that the mother is able to properly nurture the child. He recommended that it is in the child's best interest that she live with the mother.
Although I find many of his observations credible, I also find that his opinion and recommendation are deeply undermined because of his obvious bias in favor of mothers.
The other evidence that mother introduced to support the child's immediate change of residence and school relates to the father's interference with the mother-child relationship by hampering contact, failing to take the child to court-ordered counseling and discouraging the counseling, and missing the child's dental appointments, resulting in her dentist terminating services.
The court has no doubt that the father, even though represented by capable counsel, disobeyed court orders and attempted to frustrate and damage the mother-child relationship. He thereby inflicted damage upon himself and was ordered to pay attorney's fees and civil penalties. I agree with the attorneys for the mother and the child that the father's noncompliance with applicable court orders is relevant to a custody determination; however, in the final analysis the focus of the inquiry must always be on the best interests of the child involved.
Despite his actions, which are viewed with disfavor by this court and are not condoned, he loves the child and the child loves him. He has provided a stable home for the child for more than the past five years. He has seen to it that the child regularly attends school, where she does reasonably well. She is reasonably well-behaved, clean, well-dressed and healthy, and aside from the stress and turmoil created by the actions of both parents during this litigation (the father to a somewhat greater degree), which impact upon her greatly, she appears CT Page 8505 happy.
The father resides in Norwich with his fiancee, who is expecting their child about January, 1995.
The record is sparse on the nature and character of the homes in which each parent resides and the persons with whom they reside, who would be Sonja's caregivers in the absence of the parents.
The court must bear in mind the care, nurturing and stability the father has provided Sonja for over five years, during which, the mother-daughter relationship aside, he has done a reasonably good job of parenting the child. At the same time, the court must note the mother's long period of drug use and abuse and her continued fragility and need for substantial ongoing aftercare.
The mother has been a substance abuser for a number of years. She entered into and continues after care in treatment and has been drug free for over one year. She has faithfully abided by all of the orders of the court, and she must be commended for beginning to put her life in order. She now lives with her parents, her fiance and a child of this relationship, and works part time in a day care center as an aide.
I find that presently, insufficient time has passed to demonstrate the mother's return to a stable, reasonably self-sufficient lifestyle so that she would be able to provide indefinitely into the future long term and consistent nurturing of her daughter. Also, as the Family Services officer cogently points out, which underlies his recommendation, that Sonja's best interests dictate that ". . . more time is needed to strengthen [the mother-daughter relationship]".
The Family Services officer notes that the goal throughout the case was to reestablish and improve the mother-daughter relationship which had been poor for a long time. He further stated that "only recently has that relationship begun to improve" and recommended a transition period during which the mother and child would spend more time together with the ultimate goal as stated, of Sonja principally residing with the mother.
With regard to the custody of Sonja, the court ". . . may CT Page 8506 at any time make or modify any proper order regarding the education and support of the [child] and of care, custody and visitation. . . ." General Statutes § 46b-56 (a). In this determination, ". . . the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if he is of sufficient age and capable of forming an intelligent preference. . . ." General Statutes § 46b-56 (b). The best interest standard allows for a flexible, individual approach, and the court must consider not only the past behavior of each parent, but focus on and evaluate "their present and future parenting ability and the constancy of their parenting. The ultimate purpose is to ". . . [determine] which parent will better foster the [child's] growth, development and well-being."Yontef v. Yontef, 185 Conn. 275, 283 (1981).
In order to determine where the best interests of a child lie in the context of a custody dispute, the court should consider a number of factors, which include: the child's age and needs; the emotional ties of the child to her parents and of the parents to the child; each parent's parenting ability and capability; the time each parent would be able to devote to the child on a day-to-day basis; the home environment, surroundings and other adult relationships offered by each parent; the flexibility and ability of each parent to best serve the psychological development and growth of the child; the desirability of maintaining continuity and stability of the child's existing relationships, and the fostering of a belief in the child that decisions concerning her welfare are being equally considered by both parents. See Seymour v. Seymour,180 Conn. 705 (1980).
As stated, the parties have agreed on joint legal and physical custody and have actually operated for several months under the framework previously discussed. General Statutes § 46b-56a(a) provides in part: ". . . (J)oint custody means an order awarding legal custody of the minor child to both parents, providing for joint decision-making and providing that physical custody shall be shared by the parents in such a way as to assure the child of continuing contact with both parents." General Statutes § 46b-56a(b) provides (where the parents agree to joint custody, as here) that a presumption arises in such cases that such joint custody is in the child's best interests.
The court does find that both parents love and care for their daughter and that the relationship is mutual. I also CT Page 8507 believe that it is clearly in Sonja's best interest that her relationships with both her mother and father be continued and fostered, as both parents have much to offer and give her. Unless they can put aside their differences and put Sonja's interest first, however, joint legal and physical custody will be problematical and its long term success improbable.
In weighing all of the factors above discussed, in the light of the evidence and the record, the court concludes that Sonja should stay in Norwich and continue to reside with the father and attend Norwich schools, under a joint legal and physical custody order, at least through the 1994 fall school year, when a further hearing will be held, if necessary, pending the completion of the additional investigation ordered.
Accordingly, judgment may enter as follows:
(1) Joint legal and physical custody of Sonja is awarded to the parents.
(2) Sonja shall reside with mother in Colchester on Mondays from the end of school to the beginning of school on Wednesdays, each week; and, with father from the end of school on Wednesdays to the beginning of school Fridays, each week. Weekends for the intervening time (end of school Friday to beginning of school Monday) shall be alternated.[2]
(3) Father shall have the child Thanksgiving Day and Christmas Day, 1994. Mother, Halloween and Christmas Eve (9 a.m. to 9 p. m.), 1994.
(4) Prior orders relating to telephone calls are vacated; excepting, neither parent shall interfere with or obstruct the child from calling the other.
(5) Mother, after consultation with father, shall make all non-emergency decisions relating to Sonja's health care, including, but not limited to counseling, medical, psychological and dental care. Mother shall also take the child to the health care and counseling providers and use reasonable efforts to schedule the same when she has physical custody of the child.
(6) All other decision making involving the child shall be joint. CT Page 8508
(7) All other orders entered April 19, 1994, specifically including the holidays and school vacations access schedule, not inconsistent with the orders herein entered, shall remain in effect. Holiday visitation shall take precedence in the event of a conflict with regular visitation.
(8) Family Services is ordered to:
 (a) perform a home study of each parent's home and surroundings, including an interview of each adult resident therein and conduct an inquiry into the child's home conditions;
 (b) interview Sonja and her teachers and school counselors; and obtain her report cards and other records they deem relevant;
 (c) conduct such other investigation, including contact with all parties' therapists as under the circumstances they deem appropriate; and
 (d) prepare a further recommendation to this court on or before December 9, 1994.
(9) The order of the court that the defendant pay the plaintiff $25 week per until his psychological evaluation is completed is vacated effective August 22, 1994.
(10) The court shall retain jurisdiction of this matter and it is continued to December 13, 1994, for further hearing, if necessary.
Teller, J.